IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| PLAINTIFF(S)<br>William Sellers<br><br>vs.<br><br>DEFENDANT(S)<br>Ables Landscape Associates, Inc. | CIVIL ACTION No.: 2:26-cv-04521-RMG-PJG<br><br>**COMPLAINT**<br>(Jury Trial Requested) |

**COMES NOW**, Plaintiff William Sellers ("Plaintiff" or "Sellers"), by and through undersigned counsel, brings this action against Defendant Ables Landscape Associates, Inc., doing business as Ables Landscapes ("Defendant" or "Ables"), and alleges as follows:

## INTRODUCTION

1. This is an employment discrimination and medical-leave action arising from Ables's termination of William Sellers on July 22, 2025, while Sellers remained under documented postoperative medical restrictions following surgery for a recurrent perirectal fistula and abscess.

2. Only two months before his termination, Ables formally evaluated Sellers and rated him "Consistently Meets Expectations" or better in every evaluated category.

3. Ables praised Sellers as having a "[g]reat attitude" and being "always willing to step in and do what needs to be done."

4. At that time, Sellers had recently been promoted to Assistant Operations Manager and was earning $25.00 per hour.

5. Within weeks of that favorable evaluation, however, Sellers's recurrent medical condition became acute.

6. Sellers required emergency-room treatment on June 16 and June 18, 2025, followed by surgery on July 10, 2025.

7. Following surgery, Sellers's physician released him only to restricted light duty pending his first postoperative assessment on July 24, 2025.

8. The restrictions limited lifting and carrying to ten pounds, limited pushing and pulling to ten pounds, and directed Sellers to avoid excessive walking or standing.

9. Ables knew about Sellers's medical condition, surgery, and restrictions.

10. Sellers told management that he could not perform his normal work and sought to use accrued vacation or PTO during his recovery.

11. Instead of allowing Sellers to remain off work and addressing his request for medically related leave, Ables's Director of Fine Garden Maintenance, Michael Cunningham, contacted Sellers shortly after surgery because Ables had a crew without a licensed driver.

12. Cunningham told Sellers that Ables needed him and asked him to return to work to drive the crew.

13. Sellers returned at management's request and attempted to assist Ables while still within his postoperative restriction period.

14. Ables terminated Sellers on July 22, 2025, two days before his scheduled postoperative reassessment.

15. At termination, management told Sellers, among other things, that he was not a “cultural fit,” that crews did not want to work with him, and that his performance had declined.

16. Those explanations were inconsistent with Ables's May 21 written evaluation and with Sellers's disciplinary history.

17. Ables thereafter supplied additional explanations for the termination, including alleged excessive personal-cell-phone use and an alleged May 8 verbal warning that was not documented in the May 21 evaluation.

18. Ables admitted during the administrative process that Sellers had no written warnings.

19. Ables also later claimed that Sellers's performance deteriorated dramatically immediately after the May 21 evaluation, including assertions of crew complaints, substandard work, and a lost customer.

20. Sellers denies those assertions and is unaware of contemporaneous documentation establishing that he caused Ables to lose a customer.

21. The timing, changing explanations, absence of contemporaneous discipline, and treatment of Sellers during his medical episode support the inference that Ables's stated reasons were pretextual.

22. Sellers is also Black.

23. After being promoted into management, Sellers was required to continue floating between crews, leading crews, driving routes, and performing field coverage in circumstances in which similarly situated white managers were not subjected to comparable routine field assignments.

24. Sellers also encountered additional requirements in seeking further advancement that were not applied in the same manner to white management employees, including representations that he needed to obtain a horticultural certification even though white employees held comparable or higher management positions without that certification.

25. Ables ultimately invoked Sellers's supposed lack of “cultural fit” when terminating one of its relatively few Black management employees.

26. This action seeks relief for race discrimination under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981; disability discrimination and failure to accommodate under the Americans with Disabilities Act; and interference and retaliation under the Family and Medical Leave Act.

**PARTIES**

27. Plaintiff William Sellers is an adult resident of Charleston County, South Carolina.

28. Sellers is Black and is protected against race discrimination under Title VII and 42 U.S.C. § 1981.

29. At all relevant times, Sellers suffered from a recurrent perirectal fistula and abscess requiring medical treatment, emergency care, surgery, medication, and temporary physical restrictions.

30. The impairment affected and substantially limited, during its active periods and postoperative recovery, major life activities and major bodily functions including bowel function, walking, standing, lifting, and related physical activities.

31. Sellers also had a record of the impairment, including surgery in approximately October 2024 followed by recurrence, emergency treatment, and additional surgery in July 2025.

32. At all relevant times, Sellers was able to perform the essential functions of his Assistant Operations Manager position with reasonable accommodation, including temporary medically necessary leave or appropriate restricted duty.

33. Defendant Ables Landscape Associates, Inc. is, upon information and belief, a South Carolina corporation doing business as Ables Landscapes.

34. Defendant operates from approximately 4527 Highway 162, Hollywood, South Carolina 29449.

35. Defendant was Sellers's employer within the meaning of Title VII, the ADA, and the FMLA.

36. At all relevant times, Defendant employed at least fifteen employees for purposes of Title VII and the ADA.

37. Upon information and belief, Defendant employed at least fifty employees within seventy-five miles of Sellers's worksite and employed fifty or more employees for the number of workweeks necessary to constitute a covered employer under the FMLA.

## JURISDICTION AND VENUE

38. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises under federal law, including Title VII, 42 U.S.C. §§ 2000e et seq.; the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq.; 42 U.S.C. § 1981; and the Family and Medical Leave Act, 29 U.S.C. §§ 2601 et seq.

39. The Court is authorized to award legal and equitable relief under 42 U.S.C. § 2000e-5, 42 U.S.C. §§ 1981a and 12117, 42 U.S.C. § 1988, and 29 U.S.C. § 2617.

40. Venue is proper in the District of South Carolina under 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3).

41. Sellers worked for Defendant in Charleston County, South Carolina, Defendant maintains its relevant worksite in Charleston County, and the employment decisions and events giving rise to this action occurred principally within this judicial district and division.

## ADMINISTRATIVE EXHAUSTION

42. Sellers timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission alleging race and disability discrimination.

43. The Charge was assigned Charge No. 415-2025-02591.

44. The Charge alleged, among other things, discriminatory assignment, leave, discipline, reasonable accommodation, discharge, job classification, and other discriminatory treatment on the bases of race and disability.

45. The Charge was dual-filed with the South Carolina Human Affairs Commission.

46. Sellers timely responded to Ables's administrative position statement and supplied additional factual information regarding Ables's asserted reasons for termination, his medical restrictions and requested leave, and racial disparities in management assignments and advancement.

47. On July 9, 2026, the EEOC issued Sellers a Determination and Notice of Rights.

48. The EEOC stated that it would not proceed further with its investigation but expressly made no determination whether further investigation would establish a statutory violation and expressly stated that its determination did not mean Sellers's claims lacked merit.

49. This action is timely filed within ninety days of Sellers's receipt of his Notice of Rights.

50. No administrative exhaustion is required for Sellers's claims under 42 U.S.C. § 1981 or the FMLA.

**FACTUAL ALLEGATIONS**

51. Ables hired Sellers on or about March 4, 2024.

52. Sellers was initially classified as a Crew Leader and earned approximately $21.00 per hour.

53. Sellers had applied with the expectation of progressing into management and was given a development plan through which he would learn different aspects of Defendant's operations.

54. In July 2024, Defendant increased Sellers's wage to approximately $22.00 per hour.

55. In September 2024, Defendant increased his wage to approximately $23.00 per hour.

56. By January 2025, Defendant promoted Sellers to Assistant Operations Manager and increased his wage to approximately $25.00 per hour.

57. At the time of his termination, Sellers typically worked approximately forty-seven hours per week.

58. His responsibilities as Assistant Operations Manager included operational support, scheduling-related responsibilities, inspections, facilitating equipment repairs and maintenance, assisting with irrigation and enhancement work, photographing and inspecting projects, customer interaction, and keeping crews operational.

59. Defendant supplied Sellers with a business card identifying him as "Assistant Operations Manager."

60. Although Sellers remained willing to assist crews when necessary, ordinary landscaping labor was not the defining function of the management position into which Defendant had promoted him.

61. After his promotion, Sellers continued to be routinely used as a floater, substitute crew leader, driver, and field-coverage employee.

62. Sellers was repeatedly sent into the field when crew leaders or other employees were unavailable.

63. Similarly situated white managers were not routinely required to perform comparable crew-leading, floating, and field duties after moving into management.

64. Sellers sought to assume the full managerial responsibilities associated with the position for which Defendant had been developing him.

65. Sellers also sought further advancement into an Area Manager-type position.

66. In connection with that advancement, management represented to Sellers that he needed to pass a horticultural certification examination.

67. Upon information and belief, white employees occupied comparable or higher management positions without having passed that certification.

68. At least one white employee who did not hold that certification advanced into an Operations Manager position and was expected to train Sellers in managerial functions.

69. Defendant's materially different treatment of Sellers in assignments and advancement occurred against the backdrop of a management structure in which Black employees were significantly underrepresented.

70. Sellers developed a perirectal fistula or related condition in 2024.

71. He underwent surgery for the condition in approximately October 2024.

72. After that procedure, Ables permitted Sellers to perform light-duty responsibilities while he recovered.

73. Defendant therefore knew well before the events at issue in this action that Sellers suffered from the condition and that it could require surgery and temporary workplace restrictions.

74. The condition later recurred.

75. By June 2025, Sellers was suffering significant pain and physical limitations associated with the recurrence.

76. On June 16, 2025, Sellers required emergency-room treatment.

77. He was diagnosed with a perirectal abscess and received antibiotics and narcotic pain medication.

78. His emergency-room instructions warned that narcotic medication could be sedating and instructed him not to drive or operate heavy machinery while taking the medication.

79. Sellers required additional emergency treatment on June 18, 2025.

80. That visit documented a perirectal fistula.

81. Sellers informed management of the emergency treatment, his medical condition, and his continuing medical problems.

82. Management therefore knew that Sellers was experiencing an active and serious medical condition.

83. Shortly before Sellers's medical condition became acute, Defendant conducted a formal performance review.

84. The evaluation was dated May 21, 2025.

85. Defendant rated Sellers as "Consistently Meets Expectations" or better in every performance category.

86. Defendant described Sellers as having a "[g]reat attitude" and being "always willing to step in and do what needs to be done."

87. Defendant encouraged Sellers to continue learning and growing in customer relations.

88. The evaluation did not document declining work ethic, unwillingness to assist crews, a customer loss caused by Sellers, or termination-level performance problems.

89. The evaluation likewise did not document any May 8, 2025 warning concerning excessive cell-phone use.

90. Before the medical events leading to his termination, Sellers had received no written disciplinary warning.

91. Defendant later acknowledged that Sellers had no written warnings.

92. Because the condition did not resolve, Sellers required another surgical procedure.

93. Sellers underwent surgery on July 10, 2025.

94. Following surgery, Sellers's physician released him only to restricted light duty pending his first postoperative assessment scheduled for July 24, 2025.

95. The physician restricted lifting and carrying to no more than ten pounds.

96. The physician restricted pushing and pulling to no more than ten pounds.

97. The physician further directed Sellers to avoid excessive walking or standing.

98. Sellers provided Defendant with information concerning his postoperative restrictions.

99. Sellers remained within those restrictions from the time of surgery through the date Defendant terminated him.

100. Sellers also advised management that he wanted to use accrued vacation or PTO so that he could recover from surgery.

101. Sellers was willing to take unpaid leave if necessary to complete his recovery.

102. Defendant did not provide Sellers an FMLA eligibility notice, rights-and-responsibilities notice, or designation notice concerning his June and July medical absences.

103. Defendant did not meaningfully explain his entitlement to protected medical leave.

104. On Monday, July 14, 2025, only four days after Sellers's surgery, Cunningham contacted Sellers.

105. Sellers was not reporting for his ordinary work schedule and intended to use his available leave during his postoperative recovery.

106. Cunningham told Sellers that Ables needed his help because a work crew did not have a licensed driver available.

107. Sellers explained that he was recovering from surgery and could not perform his normal work.

108. Cunningham nevertheless emphasized that Ables needed Sellers to report and that all Defendant needed him to do was drive the crew.

109. Faced with this request from his director and attempting to assist his employer, Sellers returned during his postoperative restriction period.

110. Defendant assigned Sellers to drive crews and remain with them at customer properties.

111. Sellers continued to experience postoperative pain and limitations while performing these assignments.

112. Because the assignment involved extended periods at customer properties, Sellers had to manage his surgical wound and postoperative needs while working.

113. Defendant had previously been able to accommodate Sellers after his first surgery with duties such as inspections and other non-field responsibilities.

114. Defendant did not engage in a meaningful discussion with Sellers regarding whether he could instead use accrued leave, take temporary unpaid leave, perform office work, inspections, scheduling, or another available non-driving assignment during the short period before his July 24 reassessment.

115. Defendant instead used Sellers to cover its immediate staffing shortage.

116. Sellers continued assisting Defendant under his restrictions.

117. On July 22, 2025, Defendant terminated Sellers.

118. Sellers's scheduled postoperative reassessment was only two days later, on July At the termination meeting, management told Sellers that he was not a "cultural fit."

119. Management also claimed that crews did not want to work with him.

120. Defendant further cited supposed deterioration in Sellers's performance.

121. Those assertions were inconsistent with the formal evaluation Defendant had issued approximately two months earlier.

122. Defendant had not subjected Sellers to progressive written discipline between that favorable evaluation and his termination.

123. After the termination, Defendant added or emphasized further purported reasons for the discharge.

124. During unemployment proceedings, Defendant asserted that Sellers had engaged in excessive personal-cell-phone use.

125. Defendant claimed that Sellers had received a verbal warning on or about May 8, 2025.

126. Sellers denies receiving the alleged warning in the manner Defendant later described.

127. In any event, Defendant did not record such a warning in the May 21 evaluation conducted less than two weeks later.

128. Defendant also admitted that there were no written warnings.

129. Defendant later asserted that Sellers's performance had suddenly deteriorated after May 21 and before June 16, including alleged complaints from workers and an alleged lost customer.

130. Sellers denies that he caused Defendant to lose a customer and is unaware of any contemporaneous customer complaint attributing a cancellation to him.

131. Defendant's changing and expanding explanations are inconsistent with its own contemporaneous evaluation of Sellers.

132. The claimed collapse in performance also closely coincided with the period in which Sellers's recurring medical condition became increasingly symptomatic and ultimately required emergency care and surgery.

133. Defendant terminated Sellers while knowing that he remained under active postoperative medical restrictions.

134. Defendant did so before waiting the two additional days for the physician's scheduled reassessment.

135. By July 2025, Sellers had worked for Defendant continuously for more than twelve months.

136. During the preceding twelve months, Sellers had worked substantially more than 1,250 hours.

137. Sellers typically worked approximately forty-seven hours per week.

138. Upon information and belief, Defendant employed fifty or more employees within seventy-five miles of Sellers's worksite.

139. Sellers's recurrent fistula and abscess, emergency treatment, continuing medical care, surgery, and postoperative recovery constituted a serious health condition within the meaning of the FMLA.

140. Defendant knew sufficient facts to understand that Sellers's June absences and July surgery and recovery potentially qualified for FMLA protection.

141. Sellers was not required to use the words “FMLA leave” to place Defendant on notice of his need for qualifying medical leave.

142. Sellers informed Defendant about his condition, emergency treatment, surgery, restrictions, and desire to use leave to recover.

143. Defendant nevertheless failed to provide the required individualized FMLA notices.

144. Defendant instead induced or pressured Sellers to return to restricted work because it needed staffing coverage.

145. Defendant then terminated him during the same postoperative period.

146. As a direct and proximate result of Defendant's conduct, Sellers lost his employment, wages, overtime, employment benefits, and other compensation.

147. At the time of termination, Sellers earned $25.00 per hour and regularly worked approximately forty-seven hours per week.

148. Sellers has suffered and continues to suffer economic losses resulting from the termination.

149. Sellers has made reasonable efforts to mitigate his damages, including searching for employment and performing available landscaping work to support himself.

150. Sellers has also suffered emotional distress, embarrassment, anxiety, inconvenience, and other nonpecuniary harm as a result of Defendant's unlawful conduct.

151. Defendant's actions were intentional and undertaken with knowledge of Sellers's federally protected rights or with reckless indifference to those rights.

**COUNT I**

**TITLE VII RACE DISCRIMINATION**

**42 U.S.C. § 2000e-2**

153. Sellers incorporates Paragraphs 1 through 152 as if fully set forth herein.

154. Sellers is Black and is a member of a class protected by Title VII.

155. Sellers was qualified for his position and was meeting Defendant's legitimate expectations, as reflected by Defendant's May 21, 2025 written evaluation.

156. Defendant subjected Sellers to materially adverse employment actions, including materially different work assignments and termination.

157. After promotion into management, Sellers was required to continue routinely performing crew-leading, floating, driving, and field-coverage duties that similarly situated white management employees were not required to perform under comparable circumstances.

158. Defendant also applied advancement criteria to Sellers that, upon information and belief, were not applied in the same manner to similarly situated white employees.

159. Defendant terminated Sellers and told him that he was not a “cultural fit,” while relying on subjective complaints that were inconsistent with Defendant's recent written evaluation.

160. Defendant's asserted performance reasons were false, exaggerated, inconsistently stated, or were not the actual reasons motivating the adverse treatment.

161. Race was a motivating factor in Defendant's treatment of Sellers, including his assignments and termination.

162. Defendant's conduct violated Title VII.

163. As a direct result, Sellers is entitled to all legal and equitable relief available under Title VII.

**COUNT II**

**RACE DISCRIMINATION**

**42 U.S.C. § 1981**

164. Sellers incorporates Paragraphs 1 through 163 as if fully set forth herein.

165. Section 1981 guarantees Sellers the same right as white persons to make and enforce contracts and to enjoy all benefits, privileges, terms, and conditions of the employment relationship.

166. Defendant intentionally treated Sellers differently because of race with respect to the terms and conditions of his employment, managerial assignments, advancement opportunities, and termination.

167. Similarly situated white managers were treated more favorably with respect to routine field and crew assignments and advancement requirements.

168. Defendant's reference to Sellers's supposed lack of “cultural fit,” together with disparate managerial treatment and Defendant's shifting reasons for termination, further supports the inference of intentional discrimination.

169. But for Sellers's race, Defendant would not have subjected him to the same adverse terms and conditions and would not have terminated his employment under the circumstances alleged herein.

170. Defendant thereby violated 42 U.S.C. § 1981.

171. As a direct result, Sellers has suffered economic and noneconomic damages and is entitled to compensatory and punitive damages, equitable relief, attorney's fees, and costs as permitted by law.

**COUNT III**

**DISABILITY DISCRIMINATION**

**AMERICANS WITH DISABILITIES ACT**

**42 U.S.C. §§ 12101 et seq.**

172. Sellers incorporates Paragraphs 1 through 171 as if fully set forth herein.

173. At the time of the events at issue, Sellers had an actual disability and/or a record of disability within the meaning of the ADA.

174. His recurrent perirectal fistula and abscess substantially limited one or more major life activities and major bodily functions when active, including bowel function, walking, standing, and lifting.

175. His condition required multiple surgeries, emergency treatment, medication, continuing care, and documented restrictions.

176. Defendant knew about Sellers's impairment and restrictions.

177. Sellers was a qualified individual because he could perform the essential functions of the Assistant Operations Manager position with or without reasonable accommodation, including a short period of medical leave or appropriate restricted duties.

178. Defendant subjected Sellers to an adverse employment action by terminating him on July 22, 2025.

179. Defendant terminated Sellers while he remained under documented postoperative restrictions and only two days before his scheduled medical reassessment.

180. Defendant's claimed reasons for termination are undermined by, among other things, the May 21 evaluation, absence of written discipline, timing of the medical crisis and discharge, and Defendant's changing explanations.

181. Sellers's disability was a but-for cause of the termination.

182. Defendant thereby violated the ADA.

183. Sellers is entitled to all remedies available under the ADA.

**COUNT IV**

**FAILURE TO PROVIDE REASONABLE ACCOMMODATION**

**AMERICANS WITH DISABILITIES ACT**

**42 U.S.C. §§ 12111-12112**

184. Sellers incorporates Paragraphs 1 through 183 as if fully set forth herein.

185. Sellers was an individual with a disability known to Defendant.

186. Defendant knew of Sellers's medical limitations and received information concerning his postoperative restrictions.

187. Sellers communicated his need for a temporary adjustment in the manner in which he worked, including his desire to use accrued leave during his recovery.

188. That communication was sufficient to place Defendant on notice that Sellers needed an accommodation because of a medical condition.

189. Reasonable accommodations available under the circumstances included a short period of medical leave through his postoperative reassessment, appropriate use of accrued PTO, temporary unpaid leave, or restricted non-field managerial duties compatible with his limitations.

190. Defendant had previously demonstrated that restricted duties were available when it accommodated Sellers after his earlier surgery.

191. Instead of engaging in a good-faith interactive process concerning Sellers's limitations and requested leave, Defendant prioritized an immediate staffing need and called Sellers back to cover a crew that lacked a licensed driver.

192. Defendant failed to meaningfully evaluate available accommodations that would have allowed Sellers to complete the short postoperative recovery period and then return to unrestricted duties.

193. Defendant terminated Sellers before the restrictions could be reassessed on July 24, 2025.

194. Defendant failed to provide a reasonable accommodation and failed to engage in the interactive process in good faith.

195. As a direct and proximate result, Sellers suffered loss of employment, compensation, benefits, and other damages.

**COUNT V**

**FMLA INTERFERENCE**

**29 U.S.C. § 2615(a)(1)**

196. Sellers incorporates Paragraphs 1 through 195 as if fully set forth herein.

197. Defendant was a covered employer under the FMLA.

198. Sellers was an eligible employee under the FMLA because he had been employed by Defendant for at least twelve months, had worked at least 1,250 hours during the preceding twelve months, and worked at a location at which Defendant employed at least fifty employees within seventy-five miles.

199. Sellers suffered from a serious health condition within the meaning of the FMLA.

200. Sellers's emergency treatment, surgery, continuing care, and postoperative recovery entitled him to FMLA-protected leave.

201. Sellers gave Defendant adequate notice of his need for medically related leave.

202. Defendant knew about Sellers's emergency-room visits, surgery, physician restrictions, and requested recovery time.

203. Defendant failed to provide Sellers the required notice of his FMLA eligibility and rights and responsibilities.

204. Defendant failed to properly designate qualifying leave as FMLA leave.

205. Sellers requested to use accrued vacation or PTO during his postoperative recovery.

206. Rather than permit Sellers to exercise his medical-leave rights, Defendant contacted him during the recovery period and pressured or induced him to return because Defendant needed a licensed driver for one of its crews.

207. Defendant may not require an FMLA-eligible employee to accept light-duty work in lieu of exercising the employee's right to FMLA leave.

208. Defendant's conduct interfered with, restrained, and denied Sellers's exercise or attempted exercise of rights protected by the FMLA.

209. Defendant then terminated Sellers before the conclusion of the postoperative restriction period.

210. Sellers was prejudiced by Defendant's interference and suffered loss of employment, wages, benefits, and other compensation.

211. Defendant's violations were willful and were not based upon a good-faith, objectively reasonable belief that its conduct complied with the FMLA.

212. Sellers is entitled to damages and equitable relief under 29 U.S.C. § 2617, including lost compensation and benefits, interest, liquidated damages, appropriate equitable relief, attorney's fees, and costs.

**COUNT VI**

**FMLA RETALIATION**

**29 U.S.C. § 2615(a)(2)**

213. Sellers incorporates Paragraphs 1 through 212 as if fully set forth herein.

214. Sellers engaged in activity protected by the FMLA by taking medically necessary absences, notifying Defendant of his serious health condition and surgery, and requesting or attempting to use leave during his postoperative recovery.

215. Defendant knew that Sellers had engaged in this protected activity.

216. Defendant terminated Sellers on July 22, 2025.

217. The termination occurred in extraordinarily close temporal proximity to Sellers's surgery and request for recovery leave and while his postoperative restrictions remained active.

218. Defendant's asserted reasons for the termination are contradicted by its favorable May 21 evaluation, lack of written discipline, and changing post-termination explanations.

219. Defendant would not have terminated Sellers at that time but for his exercise or attempted exercise of FMLA-protected rights.

220. Defendant's conduct constitutes unlawful retaliation under the FMLA.

221. As a direct result, Sellers suffered lost wages, overtime, benefits, and other damages recoverable under 29 U.S.C. § 2617.

222. Defendant's violation was willful, and Sellers is entitled to liquidated damages unless Defendant proves the statutory good-faith defense.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff William Sellers respectfully requests that judgment be entered in his favor and against Defendant and that the Court:

A. Declare that Defendant's acts and practices violated Title VII, the Americans with Disabilities Act, 42 U.S.C. § 1981, and the Family and Medical Leave Act;

B. Award Plaintiff all lost wages, overtime compensation, benefits, and other back-pay damages from the date of termination through judgment, subject to lawful mitigation;

C. Order reinstatement to an appropriate position or, if reinstatement is not feasible, award reasonable front pay;

D. Award all compensatory damages available under Title VII, the ADA, and 42 U.S.C. § 1981, including damages for emotional distress and other nonpecuniary loss;

E. Award punitive damages under Title VII, the ADA, and 42 U.S.C. § 1981 to the extent permitted by law;

F. Award Plaintiff all damages available under the FMLA, including lost wages and employment benefits, interest, and an equal amount as liquidated damages;

G. Award appropriate equitable and injunctive relief, including correction of Plaintiff's employment record and such other relief necessary to remedy Defendant's unlawful practices;

H. Award prejudgment and post-judgment interest to the maximum extent permitted by law;

I. Award Plaintiff reasonable attorney's fees and litigation expenses pursuant to 42 U.S.C. §§ 1988, 2000e-5(k), and 12205 and 29 U.S.C. § 2617(a)(3);

J. Award Plaintiff his taxable costs;

K. Award such other and further legal or equitable relief as the Court deems just and proper; and

L. Permit no duplicative recovery while awarding Plaintiff the maximum relief authorized by the applicable statutes.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues for which a jury trial is available.

Respectfully submitted,

**WHITSITT LAW FIRM, LLC**

s/ Michael A. Whitsitt
Michael A. Whitsitt
Federal Bar No. 12505

South Carolina Bar No. 100323
78 Folly Road, Suite B9 #1405
Charleston, South Carolina 29407
Telephone: (843) 548-7551
Email: michael@whitsittlawfirm.com
Attorney for Plaintiff William Sellers

Charleston, South Carolina
October 8, 2026